Approved: _____
          BENJAMIN A. GIANFORTI/DANIEL LOSS
          Assistant United States Attorneys

Before:   HONORABLE ANDREW E. KRAUSE
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :    21 Mag.  1699
                                  :
UNITED STATES OF AMERICA          :    SEALED
                                  :    COMPLAINT
                                  :
                                  :    Violations of
      - v. -                      :    15 U.S.C. §§ 78j(b) &
                                  :    78ff; 17 C.F.R. § 240.10b-5;
                                  :    and 18 U.S.C. § 1343
JOSEPH CIMINO,                    :
                                  :    COUNTY OF OFFENSE:
      Defendant.                  :    Orange
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          MARISSA TUOHY, being duly sworn, deposes and says that
she is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

## COUNT ONE
### (Securities Fraud)

          1.   From at least in or about 2014 through at least in or
about 2018, in the Southern District of New York and elsewhere,
JOSEPH CIMINO, the defendant, knowingly and willfully, directly
and indirectly, by use of the means and instrumentalities of
interstate commerce, and of the mails and of facilities of
national securities exchanges, in connection with the purchase
and sale of securities, would and did use and employ, in
connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, contrary to
Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material fact and omitting to state
material facts necessary in order to make the statements made,
in the light of the circumstances under which they were made,

not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, CIMINO made false and misleading representations by interstate wire communication to solicit and maintain investments in a tequila company.

(Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5)

## COUNT TWO
### (Wire Fraud)

2.   From at least in or about 2014 through at least in or about 2018, in the Southern District of New York and elsewhere, JOSEPH CIMINO, the defendant, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, CIMINO made false and misleading representations by interstate wire communication to solicit and maintain investments in a tequila company.

(Title 18, United States Code, Section 1343)

The basis for my knowledge and the foregoing charges are, in part, as follows:

3.   I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter.  I have been a Special Agent with the FBI for approximately three years. I am currently assigned to a white-collar crime squad in the FBI's New York Field Office.  Before that, I was employed as a criminal defense lawyer for approximately eight years.  I have received training regarding securities and wire fraud and have been involved in investigations relating to violations of the federal securities laws and related offenses.

4.   This affidavit is based upon my review of documents and my interviews of witnesses.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned

during the course of my investigation.  Where the contents of
documents and statements of others are reported herein, they are
reported in substance and in part.  Where figures, calculations,
and dates are set forth herein, they are approximate, unless
stated otherwise.

### The Scheme to Defraud Victim-1

5.    Based upon my interviews of witnesses and my review of
documents, including documents provided by witnesses, documents
received from the Securities & Exchange Commission, open source
records, bank account statements, and electronic communications
between JOSEPH CIMINO, the defendant, and investors in a tequila
company (the "Tequila Company"), I have learned that:

a.    CIMINO's professional background is in the food
and beverage and hospitality industries. At some point prior to
in or about December 2014, CIMINO conceived of starting the
Tequila Company, established an LLC for the company based in
Warwick, New York, in Orange County, and set about finding
investors. Until in or about August 2017, CIMINO owned
approximately 51% of the membership interests in the Tequila
Company and, until in or about January 2018, served as its
Managing Member under the terms of the Tequila Company's
operating agreement (the "Operating Agreement"), which was
amended at least once during the relevant period. The versions
of the Operating Agreement that I have reviewed have all
included the following provision, in substance and in part: that
the Tequila Company "shall pay directly or reimburse the
Managing Member for certain expenses of the Company incurred by
the Managing Member in the management of the Company's
business." The operating agreement that appears to have come
into effect in or around April 2016 provided further, in
substance and in part, that the "payment of compensation to the
Managing Member" requires "the consent of the Members holding at
least sixty-six (66%) percent of the total Membership Interests"
(the "Amended Operating Agreement").

b.    CIMINO ran the Tequila Company day-to-day and was
the face of the company. The Tequila Company launched its
initial line of tequilas, which were made in Mexico, in Las
Vegas, Nevada in or around 2016. Based on my review of internal
documents from the Tequila Company, and communications with a
former Tequila Company executive ("Employee-1"), I have learned

that, during the relevant period, all of the Tequila Company's
sales were through a U.S. importer that handled both importing
the tequila from Mexico into the United States and selling the
tequila on to U.S. distributors (the "Importer"). In other
words, during the relevant period, in order to make sales and
distribute product in the United States, the Tequila Company
first had to import tequila through the Importer.

     c.  CIMINO was introduced to a number of investors in
the Tequila Company by a financial advisor (the "Financial
Advisor"). As discussed in more detail below, beginning at least
in or about December 2014, CIMINO made numerous false and
misleading representations to investors and prospective
investors including, among other things, fabricating the
existence of some current investors in the Tequila Company,
overstating the amount of funds previously invested by others,
falsifying the Tequila Company's financial performance and
progress in penetrating new markets, and falsely claiming that
inventory had been destroyed in a hurricane.

     d.  Based in part on these false and misleading
representations, CIMINO solicited and received at least
approximately $935,000 in equity investments in the Tequila
Company from a total of at least approximately 25 investors.

     e.  CIMINO used interstate wires to execute his
scheme.  For example, he frequently communicated with investors
by email which travelled interstate and caused the Tequila
Company's counsel (the "Tequila Company's Counsel") to do the
same.  In addition, in accordance with CIMINO's instructions,
several investors transmitted their investments to the Tequila
Company's bank account in New York (the "Tequila Company
Account") by wire transfer, in some cases from bank accounts
located outside New York.

     f.  During the relevant period, CIMINO had sole
signatory authority over the Tequila Company Account, and he
wired approximately $472,000 from the Tequila Company Account to
a personal bank account, over which he also had sole signatory
authority (the "Cimino Account"). As discussed in more detail
below, CIMINO used investor money to pay for personal expenses
contrary to the representations contained in, among other
things, the Operating Agreement and the Amended Operating
Agreement.

4

g.    At some point prior to in or about October 2015,
the Financial Advisor introduced CIMINO to a potential investor
("Victim-1"), who was interested in investing in the Tequila
Company through an investment vehicle Victim-1 had established
with other investors (the "Investment Vehicle"). In or about
October 2015, Victim-1 and his counsel ("Victim-1's Counsel")
began negotiating the terms of the Investment Vehicle's
investment in the Tequila Company with CIMINO.

h.    On or about December 2, 2015, the Tequila
Company's Counsel sent Victim-1's Counsel a list of the Tequila
Company's "current . . . investors/members" (the "Investor
List") via email, copying CIMINO, Victim-1, and another
individual. It is clear from the email thread that the Tequila
Company's Counsel is acting at CIMINO's direction. The document
listed approximately ten purported investors, not including
CIMINO, who was listed as the 51% owner of the Tequila Company
with a capital contribution of "Cash and Services in Kind."
These ten purported investors had supposedly invested
approximately $390,000 in the Tequila Company. Among the
purported investors were three who, as described below, were
fake ("Fake Investor-1," "Fake-Investor-2," and "Fake Investor-
3").  According to the Investor List, Fake Investor-1 had
purportedly invested approximately $100,000; Fake Investor-2 had
purportedly invested approximately $50,000; and Fake Investor-3
had purportedly invested approximately $10,000.

i.    On or about December 28, 2015, CIMINO sent
Victim-1 an executive summary (the "2016 Executive Summary") and
projected profit and loss ("P&L") statement for 2016 (the "2016
P&L Statement") via email. CIMINO's email stated, in substance
and in part, that the Tequila Company had "a total of 1950 cases
committed to different Distributors" and that the Importer had
"advanc[ed] an order of a full container [of tequila] to be
delivered in April/May [2016]."  The 2016 Executive Summary
stated, in substance and in part, that the Tequila Company's
capital goal was $1,000,000 in investments, and that
approximately half of that total had already been raised. The
2016 Executive Summary also stated, in substance and in part,
that "[t]he first container of more than 20,000 bottles ha[d]
arrived at the Distillery in Mexico [the ("Distillery")] and
[was] waiting to be filled." The 2016 P&L Statement projected
profitability in 2016 of nearly $150,000 based on projected

sales of approximately $1,233,000. As set forth below, all of these statements were false or misleading:

        i.    Based on my review of records from the Distillery, I know that the Tequila Company did not place any orders for tequila with the Distillery until in or around the first or second quarter of 2017. CIMINO also did not order any bottles for the Distillery's use until in or around the end of 2016 or the beginning of 2017, approximately one year after CIMINO's email to Victim-1 discussed above.

        ii.    Based on my review of records from the Importer, I know that the Tequila Company made no sales to the Importer in 2015 or 2016, contrary to CIMINO's statement that, as of his December 28, 2015 email to Victim-1, the Importer had already "advanc[ed] an order of a full container [of tequila] to be delivered in April/May [2016]." Based on communications between Victim-1 and Employee-1, as well as my interview of Employee-1, I understand that Employee-1 reviewed the Tequila Company's records and confirmed that the Tequila Company made no sales of tequila until some point in or around the first half of 2017.

        iii.    Based on my review of bank records for the Tequila Company Account, I know that, as of on or about December 28, 2015, the Tequila Company had raised only approximately $222,941.91 in capital, substantially less than the approximately $500,000 that CIMINO indicated had already been raised.

        iv.    Based on the foregoing, the projection of profitability in the 2016 P&L Statement was false, as it was based on non-existent sales.

        j.    On or about April 20, 2016, the Investment Vehicle wired approximately $150,000 to the Tequila Company Account from a bank account in Pennsylvania (the "Investment Vehicle Account").

        k.    On or about July 18, 2017, CIMINO sent Victim-1 and the other investors in the Tequila Company an investor report and P&L statement for the second quarter of 2017 (the "Q2 2017 P&L Statement") via email. CIMINO's email stated, in substance and in part, that the Tequila Company had sold approximately 891 cases in Puerto Rico year-to-date and that,

overall year-to-date, the Tequila Company had "delivered" approximately 3,410 cases, with orders for approximately 2,050 cases to be filled and approximately 650 cases ordered for "Fall Delivery." The Q2 2017 P&L Statement reported, in substance and in part, sales of approximately 115 cases of tequila in January 2017, 125 cases in February 2017, 220 cases in March 2017, 775 cases in April 2017, 750 cases in May 2017, and 1,425 cases in June 2017. The Q2 2017 P&L Statement also contained a line item expense for insurance. As set forth below, all of these statements were false:

       i.    Based on records from the Importer that I have reviewed, I know that the Tequila Company made no sales to the Importer in January 2017, February 2017, March 2017, April 2017, and May 2017 and sold approximately 350 cases to the Importer in June 2017. It was thus false that the Tequila Company had delivered thousands of cases of tequila in 2017, since only approximately 350 cases had been ordered from the Importer for import into the United States as of July 2017.

       ii.    Based on communications between Victim-1 and Employee-1 that I have reviewed, I understand that the Tequila Company's total sales in Puerto Rico during the relevant period were no more than approximately 160 cases of tequila on a single occasion (substantially less than the 891 cases falsely represented in the 2017 P&L Statement).

       l.    Later on or about July 18, 2017, CIMINO sent Victim-1 a projected cash flow statement for the Tequila Company through May 1, 2018 via email. From on or about July 18, 2017 through on or about July 20, 2017, CIMINO and Victim-1 exchanged emails in which they discussed, in substance and in part, that CIMINO needed approximately $50,000 to $150,000 in additional funding to keep the Tequila Company going. On or about July 31, 2017, CIMINO sent the following email to Victim-1, in substance and in part:

    After carefully looking at the Cash Flow analysis done i can say with all security that these numbers are correct.

    The question posed was how many cases can you sell? My immediate reaction was 10K cases, however i always think "from now on" and not counting what we have done, thus came the confusion of total sales.

7

It is my hope that with what we have achieved so far
(about 3500 cases) that will be adding another 10K cases
by the end of the year totaling 13K cases more or less

When we looked at the total sales on the cash flow
analysis the revenue from June 2017 to May 2018 are
correct at $ 3,531,512.00 . . .

These Numbers are taken from Projected Sales Budget of
2017 (July-December) and of 2018 (January-May).

July has not closed yet but it looks on target.

At this point have sweated it out and have managed to
stay afloat and keep going with day to day business.
The questions remains as to how much do i need to get us
through the next few months till the AR start to arrive
on a monthly basis.

$100,000 additional capital is needed

. . . .

$50,000 would be a great cushion to have available if
needed.

       m.    As set forth above, CIMINO's representation about
the Tequila Company having sold 3,500 cases of tequila year-to-
date was false. Thus, contrary to CIMINO's statements to Victim-
1 on or about July 31, 2017, the "numbers" were not "correct."

       n.    On or about August 3, 2017, Victim-1, on behalf
of the Investment Vehicle, offered to invest an additional
$75,000 in exchange for an additional 7.5% ownership interest in
the Tequila Company, which would come out of CIMINO's 51% stake.
CIMINO accepted the offer the same day. Thereafter, Victim-1's
Counsel and the Tequila Company's Counsel began negotiating the
terms of the Investment Vehicle's additional investment.

       o.    On or about August 9, 2017, in response to
requests from Victim-1's Counsel, the Tequila Company's Counsel
sent Victim-1's counsel an updated investor list for the Tequila
Company (the "Updated Investor List") via email, copying CIMINO,

Victim-1, and others. The Updated Investor List again listed Fake Investor-1, Fake Investor-2, and Fake Investor-3 among the Tequila Company's investors. Later the same day, the Investment Vehicle wired approximately $75,000 to the Tequila Company Account from the Investment Vehicle Account.

        p.   On or about October 25, 2017, CIMINO sent Victim-1 and the other investors in the Tequila Company an investor report and P&L statement for the third quarter of 2017 (the "Q3 2017 Report") via email. The Q3 2017 Report stated, in substance and in part, the following:

**SALES (Year-to-Date)**

| | |
|---|---|
| PA | 1,115 cases |
| MD, DC, DE | 632 cases |
| SC | 898 cases |
| GA | 634 cases |
| PR | 2,756 cases |
| TOTAL | 6,035 cases |

    . . . .

As you all know, Puerto Rico was damaged badly during Hurricane Maria and as a result, our distributor . . . lost 800 cases of [tequila] that were on hand at its warehouse. The distributor's Insurance will reimburse him for lost inventory but it may take a long time. In the interim, this will put pressure on our receivables cash flow. . . .

As of this week, we have secured Distribution in . . . Texas.

        q.   I have reviewed an annotated version of the Q3 2017 Report prepared by Employee-1 based on Employee-1's review of the Tequila Company's records and knowledge of the Tequila Company's sales. Based on that annotation, and my discussions with Employee-1, I understand that all of the foregoing statements were false. The Tequila Company's actual year-to-date sales in Pennsylvania were approximately 638 cases; in Maryland, the District of Columbia, and Delaware, approximately 95 cases; in South Carolina, approximately 183 cases; in Georgia, approximately 220 cases; and, in Puerto Rico, approximately 120

cases. Employee-1 also confirmed, after speaking with the Tequila Company's distributor in Puerto Rico, that no tequila was lost during Hurricane Maria. In addition, Employee-1 confirmed that, at the time when CIMINO emailed the Q3 2017 Report, the Tequila Company had not secured distribution in Texas.

r.    At some point between on or about October 25, 2017 and on or about November 21, 2017, CIMINO became unavailable for a period of time. Prior to this period, CIMINO instructed an individual close to him ("Individual-1") and Employee-1 to run the Tequila Company on CIMINO's behalf. In transferring control of the Tequila Company in part to Employee-1, CIMINO caused the Tequila Company's Counsel to grant Employee-1 access to the Tequila's Company's records, including CIMINO's email. On or about November 21, 2017, Employee-1 and Individual-1 met with Victim-1 and told Victim-1, in sum and substance, that they believed that both the Q3 2017 Report and the Updated Investor List were fraudulent.

s.    On or about December 26, 2017, Victim-1 sent an email to the Tequila Company's investors, copying CIMINO, that stated, in substance and in part, the following:

2.    The list of members attached to the Operating Agreement . . ., which is the governing document of the members, is false. [Individual-1] informed me that various members listed are "phantom" members; that they did not invest and that [CIMINO] forged their signatures on the Operating Agreement. We have further confirmed these false representations as several of the individuals copied on this email are not named as members on either the list that was provided to us (attached to the Operating Agreement) when we first invested in April 2016 or when we invested additional capital in August 2017. In fact, at no time during our involvement with [the Tequila Company] have we ever received an accurate investor listing, which is required by the Operating Agreement.

3.    [Individual-1] informed me that the financial statements provided to the members by [CIMINO] were falsified. We were able to confirm that the quarterly investor updates provided by [CIMINO] contained gross

misinformation on sales and the financial condition of
[the Tequila Company]. The Company is not doing well, as
claimed by [CIMINO] and outlined in the false financial
statements and quarterly reports. In fact, it appears
the Company is insolvent. The Company's accounts payable
vastly outweigh its receivables, and moreover, the
capital invested by the members appears to be
substantially gone.

4. [The Investment Vehicle] invested additional funds
into [the Tequila Company] in August 2017 based on
fraudulent sales reports and grossly inflated sales
projections.

5. [Individual-1] informed me that [the Tequila
Company's] funds have been comingled with personal funds
. . . .

        t.   At the conclusion of the email, Victim-1 called
for a meeting of the Tequila Company's investors in January 2018
to discuss the company's future and to potentially remove CIMINO
from his managerial role with the company pursuant to the terms
of the Amended Operating Agreement.

        u.   Later that day, CIMINO responded to Victim-1's
email, stating, in substance and in part, the following:

Here is where i made a mistake nearly 2 years ago. For
the sake of [Victim-1's] investment i indeed altered the
Members list . . . to satisfy [Victim-1's] requirements
for an investment. I shouldn't have altered the list,
deceive him, and perhaps made another mistake in adding
[Victim-1] to our family as a few of you had concerns.
To this I sincerely apologize.

        v.   In response to Victim-1's third allegation
regarding the falsification of financial statements, CIMINO
stated, in substance and in part, "[Victim-1] is talking about
the info I sent him and only him and not to you." In response to
Victim-1's fourth allegation regarding Investment Vehicle's
being induced to invest further funds based on CIMINO's false
representations, CIMINO stated, in substance and in part,
"[t]his statement unfortunately is correct. It may be in the
best interest of [the Tequila Company] to reimburse [Victim-1]

for all his investments in [the Tequila Company]." In response
to Victim-1's fifth allegation about the commingling of company
and personal funds, CIMINO stated, in substance and in part,
"This is serious allegation on [Victim-1's] part and completely
false. I have not used [the Tequila Company's] Funds for
personal gain. My expenses accrued on a month basis have been
paid through the company and are backed by a [*sic*] accurate
expense report and receipts for each month for the past 3
years."

      w.  On or about January 11, 2018, the Tequila
Company's investors and CIMINO convened at a hotel in New
Jersey. During the meeting, the investors voted to remove CIMINO
from his managerial position with the Tequila Company. The
investors voted to appoint Victim-1 as the acting Managing
Member of the company.

      x.  As noted above, the Tequila Company's Amended
Operating Agreement provided, in substance and in part, that the
Managing Member — that is, CIMINO — could only draw compensation
from the Tequila Company if such compensation was approved by at
least 66% of the Tequila Company's Members. The Operating
Agreement and Amended Operating Agreement also provided for
reimbursement of the Managing Member for "certain expenses of
the Company incurred by the Managing Member in the management of
the Company's business." As also noted above, during the
relevant period, CIMINO wired approximately $472,000 from the
Tequila Company Account to the Cimino Account. Based on my
review of an analysis of the funds flowing in and out of the
Tequila Company Account and the Cimino Account, I believe that
CIMINO used the Tequila Company's assets for personal expenses,
contrary to the representations contained in the Operating
Agreement, the Amended Operating Agreement, and CIMINO's email
to the Tequila Company's investors on or about December 26, 2017
described above. The approximately $472,000 that CIMINO wired to
the Cimino Account from the Tequila Company Account reflects
approximately 94% of the funds that flowed into the Cimino
Account during the relevant period. The Cimino Account then
reflects substantial sums being used on apparently personal
expenses. For example, I believe that CIMINO spent a substantial
portion of company funds provided by investors on groceries, pet
supplies, and personal entertainment, among other personal
expenditures.

6.   On or about February 24, 2020, I and another Special
Agent with the FBI stopped JOSEPH CIMINO, the defendant, as he
was coming through customs at Newark Liberty Airport. After
being *Mirandized*, CIMINO executed a written waiver of his rights
and agreed to speak with us.

a.   During the interview, CIMINO admitted that he
fabricated investors on the investor lists circulated to Victim-
1 and other investors in the Tequila Company. We provided CIMINO
with the Updated Investor List and he circled the investors that
he had fabricated. Those investors were: Fake Investor-1, Fake
Investor-2, and Fake Investor-3. As set forth above, these
purported investors appeared on the Investor List sent to
Victim-1 on or about December 2, 2015 and on the Updated
Investor List sent to Victim-1's Counsel on or about August 9,
2017.

b.   During the interview, we showed CIMINO a copy of
his December 26, 2017 response to Victim-1's email to the
Tequila Company's investors of the same date. CIMINO confirmed
that he had written the response and stated that what he had
written was true. CIMINO also admitted that his assertions in
the Q3 2017 Report about tequila being destroyed in Puerto Rico
during Hurricane Maria were false and that the Tequila Company
had never had insurance. CIMINO again denied having used company
money for personal expenses.

13

WHEREFORE, deponent prays that JOSEPH CIMINO, the defendant, be arrested, and imprisoned or bailed as the case may be.

*/s/ Marissa Tuohy* (by AEK, with permission)
(credentials inspected: FBI # 27496)

_____

MARISSA TUOHY
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1
On: February 12, 2021

**By FaceTime**

_____

HONORABLE ANDREW E. KRAUSE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK